# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 03, 2015

## GARY BOHANNON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 0803684     Chris Craft, Judge**

---

**No. W2014-01368-CCA-R3-PC  - Filed May 19, 2015**

---

The petitioner, Gary Bohannon, was convicted of first degree (premeditated) murder and received a life sentence.  He filed a petition for post-conviction relief, which the post-conviction court denied.  He now appeals, arguing that his right to due process and a fair trial was violated by statements that the trial court made to the jury during voir dire.  He also argues that he received ineffective assistance of counsel when trial counsel did not object to the statements of the trial court, failed to ask for a continuance or a recess after the direct testimony of a witness, failed to locate and call a witness, and erroneously stated in closing argument that the petitioner made a statement to police.  After a thorough review of the record, the briefs of the parties, and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Terrell L. Tooten, Memphis, Tennessee, for the appellant, Gary Bohannon.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Chris Lareau, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS AND PROCEDURAL HISTORY

This post-conviction appeal arises from the petitioner's fatal shooting of the victim in an automobile repair shop. On direct appeal, this court set forth the following facts of the case:

On October 17, 2007, Ronald Moore was shot to death at Allstar Auto Repair, a Memphis auto-body shop. He suffered seven gunshots wounds and died on the floor of the shop before the paramedics arrived. Tashe Disroe, who had met the victim for the first time that day and knew him by his nickname, Twin, recalled that the victim was helping her friend, Larry Ambrose, transport some new tires and wheel rims to the shop to see if they matched Ambrose's car that was being painted. She and Mr. Ambrose arrived at the shop at 8:00 in the evening, and she sat in a chair while everyone else spent time "talking [and] mingling." After spending about an hour and a half at the shop, the victim "finally showed up" with two sets of the tires and wheel rims. The men rolled the tires and rims to the car to see how they matched. About 10 minutes after the victim's arrival at the shop, "this guy walked in" and "grabbed" another man's sunglasses or hat like he was "just ... playing around, and then it turned into a different scene after that."

Ms. Disroe described the "guy" as tall and slim with a dark complexion. She said he was "not stocky at all." The man called to the victim from across the shop and said, "Twin, you need to come holler at me," and motioned for the victim to come outside with him. The victim refused to go talk to the man. The man then said to the victim, "[I]f [you] don't come holler at [me, I'm] going to kill everybody in [the shop] ... shoot everybody in [the shop]." At that point, Ms. Disroe knew that "something [wa]sn't right" and that "something was fixing to go wrong." She soon realized that "everybody was getting out of there and running because [the man] had a gun."

Ms. Disroe, Mr. Ambrose, and the victim were standing near the roll-up door of the shop when the man entered the shop. When the victim saw the man, he began to move around the car to get away from the man. For some time, both men circled the car. The man asked the victim to come outside with him several times, but the victim continued to try to get away from him. Ms. Disroe said that the victim "charged" the man in an attempt to disarm him. Within two to three seconds, Ms. Disroe heard gunshots that sounded like they "were going inside someone." Ms. Disroe was in shock, and Mr. Ambrose told her to "come on." They both fled through the roll-up door. As they ran

2

away, Ms. Disroe heard up to eight gunshots. She saw the man run from the shop and saw the victim lean against a door frame before falling to the floor.

Ms. Disroe telephoned 9-1-1, but she was shaking so badly that Mr. Ambrose took the telephone from her and spoke to the 9-1-1 dispatcher. She recalled Mr. Ambrose's walking to the front of the shop to tell the dispatcher the address of the shop. Mr. Ambrose told Ms. Disroe not to go inside the shop because he did not want her to see the victim's condition. She heard someone say that the victim was still breathing. Because no one was helping him, she entered the store and followed a trail of "blood dots" to find the victim fallen in a corner trying to breathe. She tried to move him but was unable. The victim took one deep breath. Ms. Disroe "just ran out [and] left."

When Ms. Disroe ran outside, the police had just arrived. She and other witnesses were placed in separate patrol cars and questioned. She told a male officer that she thought she could identify the shooter. Memphis Police Department (MPD) officers took Ms. Disroe to the police station, where she gave a statement and drew a diagram of the scene. Ms. Disroe identified the defendant as the shooter from a photographic array although the defendant's hair was different on the night of the offense than in the photograph. She said that she "looked at [his] face and [she] knew exactly who it was" and that the defendant was the man she "saw in the shop that night with a gun."

On cross-examination, Ms. Disroe acknowledged that she said the defendant and the victim "walk[ed]" around the car in her initial statement to the police. She explained that "[w]alking, running fast, [the victim] was trying to get away from [the defendant]. Same thing." She reiterated that the victim tried to disarm the defendant, that the two men "tussled," and that the gun went off "[a] couple seconds after" the struggle began. She said that she was "shaky" and "discombobulated" after the incident. Regarding the defendant's insistence on talking to the victim, she recalled that "something was going to happen that night whether it was going to inside that shop or on the outside."

Marcus Moore was working at Allstar Automotive on the night of the shooting. He was busy painting Mr. Ambrose's car when Mr. Ambrose and a female friend who he had never met came by the shop to deliver some new tires and wheel rims for the car. Some time later, the victim showed up with the other two sets of tires and wheel rims. Within five minutes, the defendant arrived. Mr. Moore had never met either the defendant or the victim. Mr. Moore said that there seemed to be a dispute between the two men, and when

he turned from his painting tasks, he saw that the defendant had a gun that looked like a black nine millimeter. Mr. Moore never saw the victim with a weapon. The defendant tried to get the victim to come outside, but the victim resisted. As Mr. Moore ran from the store, he heard seven rapid shots. He then waited outside for the police to arrive. He told the police that he did not think he could identify the defendant because he "didn't even look at [the defendant], once [he] saw the gun [he] just tried to get out of there."

. . . .

MPD Sergeant Kirby Brewer of the felony response team arrived at the scene at 10:10 p.m. to find that the uniformed officers had already secured the scene. He recalled that no weapons were found near the victim. Upon learning that the homicide bureau detectives were on their way, he began interviewing witnesses. He interviewed Ms. Disroe who he described as "upset" yet "able to speak with [him] and tell [him] what she had observed." Sergeant Brewer recounted the details of Ms. Disroe's statement. She told him that the victim began to back away from the defendant immediately when he saw the defendant enter the shop. She said the victim kept telling the defendant to "go on" and that the defendant told the victim that he did not want to have to shoot the victim inside the shop. Ms. Disroe told Sergeant Kirby that as she and Mr. Ambrose "stepped out" of the pull-down door, she heard seven or eight gunshots. Ms. Disroe told Sergeant Brewer that she "thought she could" identify the defendant. Sergeant Brewer left the scene at 11:30 p.m. when the homicide detectives arrived to take over the investigation.

*State v. Gary Bohannon*, No. W2010-00398-CCA-R3-CD, 2011 WL 2557005, at *1-3 (Tenn. Crim. App. June 27, 2011).

The petitioner filed a pro se petition for post-conviction relief. The post-conviction court appointed counsel, and counsel filed an amended petition. The post-conviction court held two hearings regarding the petition. At the first hearing, trial counsel and the petitioner testified, and the petitioner and Jason Mickey testified at the second hearing.

Trial counsel testified that he had been a criminal defense attorney for thirty-three years and had tried numerous first degree murder cases. He could not independently recall the trial court explaining to the jury during voir dire that the trial would be completed in one week, but he said that such a time limit was not unusual for a first degree murder case. Trial counsel did not have any concerns when hearing this statement, and he did not object to it. Trial counsel recalled that the trial took place almost two weeks before Christmas. He believed that the statement was meant to reassure the jurors that the trial would be completed

4

before Christmas and would not prevent them from completing their Christmas preparations. Trial counsel testified that if he did not object to the statement, "it didn't cause [him] any concern."

Trial counsel recalled that Tashe Disroe was one of the key witnesses for the State. Trial counsel stated that Ms. Disroe testified at trial about information that was not in her statement to police. Once Ms. Disroe testified about information not in her police statement, trial counsel attempted to impeach her through cross-examination. He did not request a recess to confer with the petitioner or a continuance to determine if there was evidence that could contradict her testimony, but he testified that it was "not that unusual" not to make such a request. Trial counsel did not feel the need to request a recess or a continuance to investigate the truth of Ms. Disroe's testimony.

The petitioner testified that he was concerned when the trial court said that the trial would only last one week because there "shouldn't be a certain time limit on how long the trial would last." The petitioner stated that the jury began its deliberations on Friday and deliberated for "about an hour" on Saturday before returning a verdict. The petitioner testified that the trial court referenced the trial being completed by Christmas, and the statement caused him concern because he believed it could have influenced the jury not to spend as much time on his case in order to return more quickly to their families.

The petitioner recalled the trial court telling the jury that the trial would not be like a case in California, which could take several weeks to complete. This statement worried the petitioner because "what's the difference for me and my case and my life, you know, being the difference for somebody else that [is] living in California." During the hearing, the post-conviction court stated that "for the record, the difference is we have completely different rules of procedure from California. They try cases two hours a day and have open discovery and we don't have those things and so there is a difference." The petitioner testified that the differences between a trial in Memphis and California was not explained to either him or the jury.

The petitioner testified that at trial, Ms. Disroe stated for the first time that she heard the petitioner say that he was going to kill everyone in the shop. He never heard or saw the statement in his pretrial discovery materials. The petitioner recalled that trial counsel did not object, take a recess, or consult with the petitioner to ascertain the best way to counter Ms. Disroe's statement. The petitioner testified that he informed trial counsel of several witnesses who could contradict Ms. Disroe's statement, and he believed that if the trial court had granted a recess or continuance, he could have produced the witnesses in court.

At the second hearing, the petitioner testified that trial counsel "kept commenting on

5

my right to remain silent, telling people that I had made a statement, but I never made a statement. I never talked to the police, at all, about the situation." He said that trial counsel told the jury that the petitioner made a statement about the crime, but he stated that he never made a statement. He believed that because he did not testify but trial counsel told the jury that he made a statement, it made the petitioner seem like he "had something to hide."

Jason Mickey testified that two men who worked at the shop, "Marcus and Chuck," contacted the petitioner through Facebook on Mr. Mickey's behalf on the day of the murder to inform him that Mr. Mickey had a vehicle for sale. The petitioner came to the auto shop and briefly spoke with Mr. Mickey. Mr. Mickey was taking the petitioner to see the vehicle when he realized that he did not have the keys to the vehicle in his pocket. He asked the petitioner to "hold on for one second," and he went to retrieve the keys. He went to use the restroom, and, while he was in the restroom, he heard gunshots. When he exited the restroom, "everyone was running," and Mr. Mickey left the shop. Mr. Mickey testified that prior to retrieving the keys, the petitioner was "cool and calm." He testified that the petitioner did not come to the auto shop until Marcus and Chuck contacted him.

Mr. Mickey did not know the present whereabouts of Marcus and Chuck. Mr. Mickey did not discuss any of his interactions with the petitioner with police officers or anyone else. He testified that Marcus and Chuck contacted him via Facebook and told him to contact post-conviction counsel and provided his phone number. Mr. Mickey contacted post-conviction counsel. He testified that he had never been previously approached by anyone to discuss the facts of the case. Mr. Mickey testified that he got in touch with post-conviction counsel "about two weeks" before he testified.

In a written order, the post-conviction court denied the petition. The court noted that it informed the jury that the trial would take one week so that the jury could make arrangements for sequestration and to reassure the jury that they would not be sequestered over the holiday. The court found that it was a common practice to inform the jury of the expected length of the trial and found that trial counsel was not deficient in failing to object and that the petitioner had not demonstrated prejudice. The post-conviction court found that a request for a continuance after Ms. Disroe's testimony would have been "highly unusual" and that there would have been no grounds to grant a continuance. The court found that trial counsel was not deficient for impeaching Ms. Disroe through cross-examination and noted that the defense still had several days after Ms. Disroe testified to generate rebuttal proof. The court also observed that the petitioner did not offer additional proof at the post-conviction hearing of evidence that could have been presented to rebut Ms. Disroe's testimony. The post-conviction court found that the testimony of Mr. Mickey was not credible for several reasons. The court further found that trial counsel's reference in closing argument to the petitioner's "statement" was not a reference to a statement given to police

or trial counsel but to the statement that Ms. Disroe testified the defendant made at the auto shop. The court found that the petitioner received excellent representation in his trial for a murder that "occurred in a public place in front of several witnesses." The court found that trial counsel was not deficient and that the petitioner had not met his burden of proving the facts in his allegations by clear and convincing evidence.

## ANALYSIS

The petitioner contends that the statements of the trial court during voir dire violated his right to Due Process and a fair trial. He also contends that trial counsel was ineffective for failing to object to the statements, failing to request a continuance or a recess after Ms. Disroe's testimony, failing to locate and call Mr. Mickey as a witness, and for stating in closing arguments that the petitioner made statements.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2010). The petitioner bears the burden of proving the allegations of fact giving rise to the claim by clear and convincing evidence. *Dellinger v. State*, 279 S.W.3d 282, 293 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). This court generally defers "to a post-conviction court's findings with respect to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013). Claims for post-conviction relief premised on ineffective assistance of counsel present mixed questions of law and fact, which this court reviews de novo with no presumption of correctness. *Id.*

### I. Due Process

The petitioner argues that the trial court made statements prior to the trial that tainted the jury pool and prevented him from receiving a fair trial. However, a ground for post-conviction relief is generally "waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." T.C.A. § 40-30-106(g). Because the petitioner could have raised the issue of the trial court's statements on direct appeal but did not do so, this issue is waived. Insofar as the petitioner alleges that trial counsel was deficient in not raising the issue, we address the question below.

7

## II. Ineffective Assistance of Counsel

The petitioner argues that he received the ineffective assistance of counsel. Specifically, he contends that trial counsel was ineffective for failing to object to the trial court's statements to the jury or requesting a curative instruction or a mistrial. He also contends that trial counsel was ineffective for failing to request a recess or a continuance to rebut the testimony of Ms. Disroe and for failing to call Jason Mickey to testify during trial.

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to counsel. This right affords an individual representation that is "within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Counsel is ineffective when "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must prove by clear and convincing evidence that: (1) counsel's performance was deficient; and (2) the deficiency prejudiced the petitioner to the degree that the petitioner did not receive a fair trial. *Strickland*, 466 U.S. at 687. A petitioner satisfies the deficiency prong of the test by showing that counsel's representation fell below an objective standard of reasonableness; that is, "the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter*, 523 S.W.2d at 936); *see Strickland*, 466 U.S. at 687. The petitioner must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Courts evaluating the performance of an attorney "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). In order to fairly assess counsel's conduct, every effort must be made "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996).

Prejudice requires the petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* If the petitioner fails to establish either deficiency or prejudice, post-conviction relief is not appropriate, and this court need not

address both components if the petitioner makes an insufficient showing as to one component. *Grindstaff*, 297 S.W.3d at 216 (citing *Goad*, 938 S.W.2d at 370).

## A. Trial Court's Statements

The defendant contends that trial counsel should have objected, requested a curative instruction, or requested a mistrial as a result of several statements that the trial court made to the jury. The trial court informed the jury:

> in this case we are trying a Gary Bohannon, and I'll introduce y'all to him in a minute. He is charged with murder in the first degree. This is a case that we are going [to] try this week and we will be finishing it this week. This is not one of those California Trials that is going to take six to eight weeks. I know that Christmas is coming up a week from Thursday, I'm well aware of that.

. . . .

> We will have closing arguments either Thursday or Friday and then if you are deliberating and you don't reach a verdict on Friday, you will be reaching a verdict on Saturday.

The post-conviction court found that this statement was made to provide the jury with a schedule for the trial, giving them adequate information to prepare for sequestration and assuaging any concern about being sequestered over the holidays. The court also found that there was nothing stated to the jury that was at all prejudicial and that the petitioner had made no showing that the jury was compelled to adhere to the anticipated schedule. We conclude that the petitioner has not shown that trial counsel was deficient for not objecting to the statements or that any alleged deficiency caused him prejudice.

## B. Testimony of Ms. Disroe

The petitioner claims that trial counsel was ineffective for failing to request a continuance or a recess after Ms. Disroe testified about a statement that the petitioner made that was not included in her statement to police. He further contends that trial counsel was ineffective for failing to call Mr. Mickey as a witness at trial because his testimony could have rebutted the testimony of Ms. Disroe.

Trial counsel testified that he did not recall feeling the need to ask for a continuance or a recess after her testimony because he intended to impeach her with her prior statement. The post-conviction court found that a request for a continuance after her testimony would

9

have been highly unusual and that there would have been no grounds to grant a continuance. The court found that trial counsel thoroughly attempted to impeach Ms. Disroe with her prior statement on cross-examination. We conclude that the petitioner has not established that trial counsel's performance was in any way deficient.

The post-conviction court specifically found that the testimony of Mr. Mickey was not credible. Despite the petitioner's assertion that "[t]he fact that the trial court did not find [Mr. Mickey] credible does not void the fact that he existed, and if believed, could have provided in whole or in part, a witness, under oath, to contradict the testimony of Ms. Disroe," this court must defer to the findings of the post-conviction court regarding witness credibility unless the record preponderates against the finding. The court found that Mr. Mickey's testimony was "completely incredible for several reasons." First, the court found that it was highly unlikely that Mr. Mickey would have known that he was the sole reason that the petitioner came to the shop on the day of the murder and proceed to keep the information hidden during the investigation and trial. Mr. Mickey would have possessed Facebook records to corroborate his story, and there was no reason to withhold the information. Second, the court found that there was no proof that "Marcus or Chuck" existed and that the petitioner provided no explanation as to why Marcus and Chuck would have contacted Mr. Mickey one month before the post-conviction hearing but not during the investigation, trial, or appeal. Third, the court found that if Mr. Mickey's testimony were truthful, the petitioner would have been aware of the reason that he came to the auto shop and would have informed trial counsel about Mr. Mickey. Finally, the court observed that the petitioner's sworn statement was that someone named "Big Daddy" told him to come to the auto shop to look at a pair of rims that Big Daddy had for sale. The court found that the petitioner never claimed in his original petition for post-conviction relief or during his testimony that "Marcus and Chuck" summoned him to the shop to look at Mr. Mickey's vehicle. The record does not preponderate against these findings, and the petitioner is not entitled to any relief.

### C. Closing Arguments

The petitioner argues that trial counsel was ineffective for saying that the petitioner "made statements," despite the fact that the petitioner did not make any statements to police. He contends that he was "greatly prejudiced" because it created the impression that he did make a statement yet did not testify at trial.

At the post-conviction hearing, post-conviction counsel did not question trial counsel about closing arguments. The petitioner testified that he never made a statement to police, and trial counsel's closing arguments referencing the statements made it seem like the petitioner "had something to hide" because he did not testify at trial. The post-conviction

court found that the record reflected that trial counsel was speaking about the petitioner's statement referenced in Ms. Disroe's testimony rather than a hypothetical statement to police. The court also found that during trial, trial counsel never indicated that the petitioner made a statement to police about the murder that was later used against him after he exercised his right to remain silent. The record does not preponderate against these findings. The petitioner has not shown that trial counsel was deficient or that he suffered any resulting prejudice, and he is not entitled to any relief.

## CONCLUSION

Based upon the foregoing reasoning, the judgment of the post-conviction court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE

11